

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-20-00271-CV

_____

PAUL REDMOND KEATING, Appellant

V.

BEVERLY CAROLYNN KEATING, Appellee

On Appeal from the 462nd District Court
Denton County, Texas
Trial Court No. 17-8369-431

Before Sudderth, C.J.; Birdwell and Bassel, JJ.
Memorandum Opinion by Chief Justice Sudderth

**MEMORANDUM OPINION**

Appellant Paul Redmond Keating challenges the trial court's spousal maintenance order. The order—which was originally entered on December 5, 2019—requires Paul to pay his ex-wife, Appellee Beverly Carolynn Keating, maintenance of $5,000 per month through February 28, 2027. Paul claims that the amount and duration of the spousal maintenance order exceed the statutory limits. *See* Tex. Fam. Code Ann. §§ 8.054(a)(1)(B) (prohibiting spousal maintenance order that remains in effect for more than seven years after the date of the order), 8.055(a)(2) (prohibiting spousal maintenance order that requires payment of more than 20 percent of the obligor's average monthly gross income).

We agree. Because there is no evidence that Paul's average monthly gross income was sufficient to authorize the $5,000 spousal maintenance order under Section 8.055 of the Texas Family Code, and because the duration of the maintenance order exceeds the applicable seven-year statutory maximum under Section 8.054 of the Texas Family Code, we will reverse the amount and duration of the spousal maintenance order and remand for a new trial on those issues.

## I. Facts

Paul and Beverly Keating were married for 28 years. Paul began pursuing his master's degree soon after the couple married, then he continued on to earn a degree

in veterinary medicine, while Beverly worked fulltime.[1]  The couple had one child—now grown—and after Paul finished his education, Beverly became a stay-at-home mother.

## A.  Financial Woes

Approximately 12 years into the marriage, Paul purchased a veterinary clinic[2]—a professional association.[3]  The clinic had financial problems almost from the start.  Paul had taken out a loan to purchase the clinic, and he repeatedly refinanced the loan over the next 15 years, while also accruing credit card debt to cover business expenses.[4]  Despite the clinic's financial issues, Paul took much of the clinic's net income out of the business (as shareholder withdrawals) to pay for his and Beverly's personal expenses.  Even with Paul's salary and shareholder withdrawals, though, the couple accrued significant personal credit card debt.  Both spouses later acknowledged that, in hindsight, they had been living beyond their means.

---

[1]Beverly had a high school diploma and an associate's degree.

[2]When Paul purchased his veterinary clinic, Beverly provided uncompensated assistance at the clinic by paying the bills and ordering supplies.

[3]At some point, the veterinary clinic was converted from a limited partnership into a professional association.

[4]Paul testified, for example, that approximately 10 years after he purchased the clinic, he had to refinance the small-business loan he used for the purchase because "we weren't making enough to pay the loan and have a living at the house."  And Beverly testified that she "had to keep finding credit cards to pay [the clinic's bills]."

## B. Divorce Litigation

In September 2017, Paul filed for divorce. Beverly counterpetitioned for divorce and requested spousal maintenance.[5] This spousal maintenance request was one of the key issues at trial and is the focus of this appeal.

## C. Bench Trial

Only the spouses testified at trial.

Paul testified that he took a salary from the clinic averaging approximately $60,000 to $80,000 per year, and that he withdrew shareholder funds of approximately $75,000 to $120,000 per year. The couple's joint tax returns reflected similar figures, showing that, in the three years preceding the divorce action, Paul and Beverly reported approximately $200,000 in total and adjusted gross personal income— $204,531 in 2014, $197,384 in 2015, and $184,280 in 2016.[6] But the parties disputed

---

[5]Pending trial, Beverly found a minimum-wage job that she subsequently lost because she was unable to stand for eight hours at a time. Although Beverly testified that she had been to a doctor for her leg issues, she did not plead or argue that she had a disability that made her eligible for spousal maintenance beyond the otherwise-applicable seven-year maximum duration. *Cf.* Tex. Fam. Code Ann. § 8.054(a)(2)(A) (authorizing an extended duration of spousal maintenance if "the ability of the spouse to provide for the spouse's minimum reasonable needs is substantially or totally diminished because of . . . physical . . . disability"). Instead, Beverly argued at trial that she was entitled to seven years of spousal maintenance based on the longevity of her marriage.

[6]From 2014 through 2016, Paul earned a salary ranging from approximately $66,000 to $86,000 and he collected shareholder withdrawals ranging from approximately $55,000 to $110,000. The couple's tax returns also reported between $5,000 and $15,000 in dividends, capital gains, IRA distributions, pensions, and

whether Paul was still making this amount at the time of trial, and they disputed whether Paul could expect to earn a similar amount in the future.

Paul testified that the clinic's income began declining in 2017. To support this contention, he offered the couple's 2017 and 2018 joint tax returns into evidence, reporting total income of $128,361 and $141,132 respectively. Paul testified that he did not expect his income to return to pre-2017 levels because the clinic could not sustain the salary and shareholder withdrawals that he had taken from the business in the past. Beverly disagreed. She insisted that the couple's pre-2017 tax returns—which her counsel summarized as "consistently [reporting] somewhere in the range of $200,000 a year"—were representative of Paul's income. During Beverly's cross-examination of Paul, her counsel repeatedly highlighted that the alleged decrease in income began after Paul filed for divorce in 2017, implying that Paul was misrepresenting his income to avoid paying Beverly spousal maintenance.

Beverly testified that, in addition to Paul's income from the clinic, Paul received occasional payments from his friends and family—payments Beverly claimed he referred to as his "gun fund." Apart from the gun fund's existence, though, Beverly did not explain much about it; the entirety of her gun-fund discussion was as follows:

> [Beverly's counsel:] [D]id you notice anything with regard to how your husband handled cash and checks and that kind of thing?

annuities. All of these sources of income were included in the total and adjusted gross income figures discussed above.

5

[Beverly:]  Yes, I did.

.  .  .  .

His friends and family would pay by checks to him personally, not the business, and cash.  And he called it his gun fund.

[Beverly's counsel:]  His gun fund?

[Beverly:]  Yes, that's what he called it.

[Beverly's counsel:]  Okay. And what would he do with these cash and checks?

[Beverly:]  He deposited into [sic] his personal account that I do not have access to.

[Beverly's counsel:]  Okay.  What about cash?

[Beverly:]  He deposited that into his personal account.

[Beverly's counsel:]  Do you know that he deposited the cash?

[Beverly:]  Yes, I did.

[Beverly's counsel]:  Okay. So you — okay.

Given the brevity of Beverly's gun-fund discussion, it is unclear from the record how frequent the gun-fund payments were, how much money they represented, and whether they were included in the couple's joint tax returns.  Nor did Beverly clarify the total monthly or annual gross income that she believed Paul had at his disposal— with or without the gun-fund payments.  Nonetheless, she responded affirmatively when her counsel asked if Paul "ha[d] the ability to pay" $5,000 per month in spousal

6

maintenance. And when asked if $5,000 "would be equal to or less than 20 percent of [Paul's] gross monthly income," Beverly testified that she "believe[d] so."

## D. Final Divorce Decree and Findings

After a bench trial, the trial court ordered Paul to pay Beverly $5,000 per month as spousal maintenance. The trial court issued its spousal maintenance order through a memorandum dated December 5, 2019. The memorandum is not part of the appellate record, but the trial court's June 2020 final decree of divorce incorporated its memorandum and stated that the spousal maintenance payments were to begin on January 1, 2020, and continue until February 28, 2027 (or earlier, if either party died or if Beverly remarried or began a romantic cohabitation).[7] Paul then timely requested findings of fact and conclusions of law, but the trial court did not file them—even after receiving a timely notice of past-due findings. *See* Tex. Fam. Code Ann. § 6.711; Tex. R. Civ. P. 296, 297.

Paul appealed,[8] challenging the amount and duration of the spousal maintenance order as well as the trial court's failure to file findings and conclusions. We abated the appeal and ordered the trial court to enter findings and conclusions.

---

[7]Neither party disputes that the final divorce decree incorporated the December 2019 spousal maintenance order.

[8]Before he appealed, Paul filed a motion for new trial arguing, among other things, that the $5,000 award exceeded 20 percent of his average monthly gross income and that the duration of the award exceeded the "shortest reasonable period." The trial court denied this motion.

7

*See* Tex. Fam. Code Ann. § 6.711(a) (providing that, upon request, the court "shall" file findings and conclusions); Tex. R. Civ. P. 297 (similar).

Having already previewed Paul's appellate arguments, Beverly filed proposed findings of fact and conclusions of law in the trial court. Paul objected and took issue with three proposed findings and conclusions, all three of which related to the amount of the maintenance award. And although the trial court largely adopted Beverly's proposed findings and conclusions, it deleted one notable provision that Paul had objected to: a proposed finding "that $5,000.00 per month is less than twenty percent (20%) of Paul Redmond Keating's average monthly gross income." With this proposed finding deleted, the trial court's findings were silent as to the amount or sufficiency of Paul's income to support the spousal maintenance award. Instead, the court simply found[9] that Beverly "[wa]s entitled [to] spousal maintenance in the amount of $5,000.00 per month for the next seven years based upon Chapter 8 of the Texas Family Code prerequisites and factors applied to the facts of this case."[10]

---

[9]The quoted statement was included as a finding of fact rather than a conclusion of law. Nevertheless, the trial court's findings and conclusions provided that "[a]ny finding of fact that is a conclusion of law shall be deemed a conclusion of law."

[10]Paul had objected to this proposed finding, but the trial court did not modify or delete it. In addition to this objection and the one discussed above, Paul's third objection challenged a proposed conclusion of law that Beverly was "entitled to receive $5,000 per month in spousal maintenance pursuant to TFC § 8.055." The trial court modified this conclusion of law to remove the reference to the $5,000 amount and instead entered a conclusion that Beverly was "entitled to receive spousal maintenance pursuant to TFC § 8.055."

After the trial court entered its findings and conclusions, we reinstated the appeal and requested supplemental briefing to address the impact of the findings and conclusions on the remaining issues in the case. Paul filed a supplemental brief addressing the trial court's findings, but Beverly did not respond.

## II. Discussion

Paul lodges two complaints against the trial court's spousal maintenance order.[11] He claims (1) that the order violates Family Code Section 8.055 because there is no evidence that the amount of spousal maintenance is equal to or less than 20 percent of his average monthly gross income, and (2) that the order violates Family Code Section 8.054 because the duration of the order exceeds the applicable seven-year statutory maximum.[12]

### A. Standard of Review

We review a trial court's award of spousal maintenance for an abuse of discretion. *Evans v. Evans*, No. 02-19-00132-CV, 2020 WL 1808294, at *4 (Tex. App.—Fort Worth Apr. 9, 2020, no pet.) (mem. op.); *Brooks v. Brooks*, 257 S.W.3d 418, 425 (Tex. App.—Fort Worth 2008, pet. denied). Under this standard, legal and

---

[11]As noted above, Paul's opening brief raised a third issue: that the trial court harmfully erred by failing to file findings of fact and conclusions of law. Because we subsequently abated the appeal and the trial court entered findings and conclusions, Paul's third issue is moot.

[12]Paul does not dispute Beverly's eligibility for spousal maintenance, *see* Tex. Fam. Code Ann. § 8.051, and he does not appear to dispute the trial court's finding that Beverly's minimum reasonable needs exceed $5,000, *see id.* § 8.052.

factual sufficiency of the evidence are not independent grounds for asserting error but are factors in assessing whether the trial court abused its discretion. *Evans*, 2020 WL 1808294, at \*4; *Brooks*, 257 S.W.3d at 425.

The amount and duration of a spousal maintenance order is discretionary only within statutory limits and only when supported by sufficient evidence. *See Evans*, 2020 WL 1808294, at \*5; *Coleman v. Coleman*, No. 2-09-155-CV, 2009 WL 4755173, at \*2 (Tex. App.—Fort Worth Dec. 10, 2009, no pet.) (mem. op.). The Family Code authorizes a trial court to order spousal maintenance only under "very limited" circumstances:

> [t]he former spouse must be "eligible" to receive spousal maintenance; the "duration" and "amount" of the payments must not exceed specified limits; the obligation must automatically terminate upon certain events; and the [trial] court must consider a wide variety of factors to "determine the nature, amount, duration, and manner of periodic payments."

*Dalton v. Dalton*, 551 S.W.3d 126, 130–31 (Tex. 2018) (internal citations and footnotes omitted); *see* Tex. Fam. Code Ann. §§ 8.051 (providing eligibility requirements), 8.052 (listing nonexhaustive factors), 8.054 (limiting duration), 8.055 (limiting amount), 8.056 (providing for automatic termination).

## B. Amount of Spousal Maintenance

First, Paul contends that the trial court abused its discretion by ordering him to pay $5,000 in spousal maintenance without any evidence that this amount was at or below 20 percent of his average monthly gross income. We agree.

Family Code Section 8.055 prohibits a court from "order[ing] maintenance that requires an obligor to pay monthly more than the lesser of: (1) $5,000; or (2) 20 percent of the spouse's average monthly gross income." Tex. Fam. Code Ann. § 8.055(a). For the trial court to order Paul to pay $5,000 per month, then, the court was required to find that this amount was no more than 20 percent of Paul's gross monthly income, i.e., that Paul had an average monthly gross income of at least $25,000 for a total annual salary of approximately $300,000. *See id.* The trial court did not acknowledge or address this requirement in its written findings,[13] and even if it had, there is no evidence in the record to support a finding that Paul's average monthly gross income met or exceeded the necessary threshold.

---

[13]Even though the trial court was given an opportunity to enter findings and conclusions supportive of the maintenance award after Paul had already appealed the award and raised the 20-percent income threshold as an issue, the trial court did not do so. The trial court's findings and conclusions do not mention the 20-percent income threshold, nor do they identify the amount of Paul's average monthly gross income, nor do they address Paul's ability to pay $5,000 in spousal maintenance. *Cf. Nath v. Tex. Children's Hosp.*, 446 S.W.3d 355, 373 (Tex. 2014) (reviewing sanctions award and recognizing that "[w]hen a trial court recites a relevant issue but fails to discuss it, we cannot automatically conclude that such cursory mention is tantamount to compliance"); *cf. also Venture Cotton Co-op. v. Freeman*, 435 S.W.3d 222, 226 & n.4 (Tex. 2014) (noting that although findings of fact and conclusions of law were filed, "these findings and conclusions shed no light on the court's reasoning"). Rather, as noted above, the trial court arguably rejected Beverly's proposed finding that the $5,000 maintenance award was equal to or less than 20 percent of Paul's average monthly gross income. *But see Norstrud v. Cicur*, No. 02-14-00364-CV, 2015 WL 4878716, at *4 (Tex. App.—Fort Worth Aug. 13, 2015, no pet.) (mem. op.) (recognizing that "the Texas Supreme court has not adopted differing standards of review for findings of fact adopted verbatim from a prevailing party's proposed findings of fact versus findings of fact not adopted verbatim or modified by the trial court").

Beverly's trial counsel elicited confirmation from Paul that, in the three years preceding the divorce action, Paul's income was "just shy of averaging $200,000 a year."[14]  This testimony was consistent with the joint tax returns the couple filed in the three years preceding the divorce action, and Beverly's counsel emphasized the point by offering these tax returns into evidence and walking Paul through them on cross-examination.  Although the parties disputed whether Paul's income had since declined—a topic on which Beverly thoroughly questioned Paul on cross-examination—no one claimed that Paul's current or future annual gross income increased to $300,000 or more.

In fact, the only trial testimony that even referenced the statutory 20-percent limitation was Beverly's statement that she "believe[d]" a $5,000 maintenance award "would be equal to or less than 20 percent of [Paul's] gross monthly income."  But this statement is conclusory and, standing alone, insufficient to support the trial court's award.  *Cf. In re Marriage of Hottinger*, No. 07-20-00211-CV, 2021 WL 4453668, at *2 (Tex. App.—Amarillo Sept. 29, 2021, no pet.) (mem. op.) (holding that wife's averment that "[husband] has committed adultery" was conclusory and was insufficient for the trial court to determine that husband in fact committed adultery);

---

[14]Beverly's counsel explained that he arrived at his $200,000 figure by averaging the couple's total and adjusted gross personal income in 2014, 2015, and 2016.  He described the $200,000 figure as "reportable income, including the salary that [Paul was] paying [him]self, as well as [his] business pass[-]through income," and Paul confirmed this characterization.

*Mathis v. Mathis*, No. 01-17-00449-CV, 2018 WL 6613864, at \*10 (Tex. App.—Houston [1st Dist.] Dec. 18, 2018, no pet.) (mem. op.) (holding that couple's inventories listing conclusory valuations for their business ownership interests were insufficient to support the trial court's determination of the value of those interests).

Tellingly, Beverly does not attempt to rely on this conclusory statement on appeal. Indeed, her brief is ambiguous as to what evidence she relies upon to show that Paul's average gross income satisfied the statutory threshold.[15] Instead, Beverly merely implies that the amount of Paul's income was more than he represented, and she alludes to two portions of testimony as support: (1) Beverly's testimony regarding the gun fund, and (2) Paul's testimony regarding the clinic's gross receipts. Neither supports the trial court's award.

First, Beverly's gun-fund testimony was too vague to support a finding that Paul had an average gross income of $25,000 monthly or $300,000 annually. Although Beverly testified that Paul received money into his gun fund, Beverly did not discuss the frequency or amount of these alleged transfers and she did not clarify whether these gun-fund payments were included in the income that the couple reported on their jointly filed federal income taxes. To the extent that Beverly relies

---

[15]Beverly's brief defends her eligibility for $5,000 in spousal maintenance based on the statutory factors in Family Code Section 8.052, but Paul does not contest Beverly's eligibility. The issue on appeal is whether Paul's income can support the $5,000 in spousal maintenance that the trial court awarded, assuming Beverly is eligible for this amount.

on her gun-fund testimony as evidence that Paul had an average gross income of at least $25,000 monthly or $300,000 annually, such reliance is misplaced.

Second, Beverly's attempt to equate the clinic's gross revenue with Paul's gross income is even further off the mark. It is undisputed that the clinic is a professional association—a separate legal entity.[16] *See* Tex. Bus. Orgs. Code Ann. § 2.108. By statute, "a professional association has the same powers, privileges, duties, restrictions, and liabilities as a for-profit corporation." *Id.*; *see also Mandell v. Mandell*, 310 S.W.3d 531, 539–40 (Tex. App.—Fort Worth 2010, pet. denied) (reviewing property division, discussing valuation of husband's interest in professional association, and recognizing that professional association was "the equivalent of a for-profit corporation"). A professional association's assets, profits, and gross revenue belong to the entity rather than to the individual shareholders. *See Mandell*, 310 S.W.3d at 539–40 (recognizing that "[t]he [a]ssociation's property, accounts receivable, retained earnings, and surplus funds are not assets of . . . [the] community estate"); *cf.* Tex. Bus. Orgs. Code Ann. § 302.011 (providing for division of profits according to

_____

[16]Beverly did not seek a finding of alter ego. *Cf. In re Marriage of Collier*, 419 S.W.3d 390, 403 (Tex. App.—Amarillo 2011, no pet.) ("While a spouse's ownership interest in a corporation can be characterized as either separate or community property, corporate assets and liabilities are owned by the corporation and, absent a finding of alter ego, are not part of the community estate."). To the contrary, at trial, Beverly's counsel emphasized that the clinic was a separate legal entity and that Beverly could not own an interest in the clinic because the clinic was a professional association and Beverly was not a veterinarian. *See* Tex. Bus. Orgs. Code Ann. §§ 301.003, .004, .007.

governing documents); *McKnight v. McKnight*, 543 S.W.2d 863, 867 (Tex. 1976) (holding court of appeals correctly concluded that "the rights of a divorcing spouse can only attach to the husband's interest in the partnership and not specific partnership property"); *Touponse v. Touponse*, No. 02-20-00285-CV, 2021 WL 2753504, at \*5 (Tex. App.—Fort Worth July 1, 2021, no pet.) (mem. op.) ("A limited-liability company is a separate legal entity, and property owned by such a company is neither the community property nor the separate property of its members."); *Mathis*, 2018 WL 6613864, at \*4 ("Property owned by a corporation is not a divorcing shareholder's separate property or community property; instead, it is a corporate asset."). The clinic's gross income is thus distinct from Paul's gross income.

Beverly has not directed us to any record evidence that Paul's average gross income was at least $25,000 monthly or $300,000 annually. Because "the amount of maintenance awarded by the trial court is discretionary only within the statutory limits," because the relevant statutory limit in this case prohibited the trial court from ordering Paul to pay more than 20 percent of his monthly gross income as maintenance, and because there is no evidence that Paul's average monthly gross income was $25,000 or more, we reverse the trial court's $5,000 maintenance order and remand for a new trial on the amount of spousal maintenance. *See Evans*, 2020 WL 1808294, at \*5 (reversing and remanding for new trial on the amount of spousal maintenance due to lack of evidence that maintenance awarded was within statutory

20-percent limitation); *In re Marriage of Franklin*, No. 10-13-00007-CV, 2013 WL 4799063, at *3 (Tex. App.—Waco Aug. 29, 2013, no pet.) (mem. op.) (similar).

## C. Duration of Spousal Maintenance

In his second issue, Paul claims that the duration of the trial court's spousal maintenance order violates Family Code Section 8.054 because the order remains in effect beyond the applicable seven-year statutory maximum.[17]

Section 8.054(a)(1) of the Texas Family Code generally limits a trial court's spousal maintenance award based on the length of the marriage. Tex. Fam. Code Ann. § 8.054(a)(1). When a couple has been married for at least 20 but not more than 30 years, as the Keatings were in this case, the Family Code provides that the trial court "may not order maintenance that remains in effect for more than . . . seven years after the date of the order." *Id.* § 8.054(a)(1)(B).

Here, no one disputes that the trial court issued its spousal maintenance order via memorandum on December 5, 2019. Indeed, the trial court recited and

---

[17]Paul also argues that, even if the duration of the spousal maintenance did not exceed the seven-year maximum, it exceeded the "shortest reasonable period" for spousal maintenance. *See* Tex. Fam. Code Ann. § 8.054(a)(2). Beverly did not respond to this argument in her brief. Regardless, because we hold that the trial court's order exceeded the seven-year statutory maximum duration, we need not address Paul's argument regarding the "shortest reasonable period" for maintenance. *See* Tex. R. App. P. 47.1.

16

referenced this December memorandum in its subsequent, written final divorce decree.[18]

Because the trial court entered the spousal maintenance order on December 5, 2019, it could not "order maintenance that remain[ed] in effect for more than . . . seven years after the date of the order" i.e., beyond Saturday, December 5, 2026 or "the next day that is not a Saturday, Sunday, or legal holiday": December 7, 2026. Tex. Fam. Code Ann. § 8.054(a)(1)(B); Tex. Gov't Code Ann. § 311.014; *see* Tex. Gov't Code Ann. § 311.005(12); Tex. R. Civ. P. 4; *Salahat v. Kincaid*, 195 S.W.3d 342, 343–45 (Tex. App.—Fort Worth 2006, no pet.) (discussing computation of deadline where statute of limitations expired "two years after the day the cause of action accrue[d]"). But the trial court's order, as memorialized in its subsequent final divorce decree, required Paul to pay spousal maintenance through February 28, 2027—seven years and eighty-five days after the date of the spousal maintenance order.

Beverly concedes that the duration of the trial court's spousal maintenance order exceeds the seven-year statutory maximum, but she attributes this to a typographical "scrivener's error" and claims the trial court intended to award no more than seven years of spousal maintenance. Beverly explains that the trial court held a

---

[18]Neither party argues that the seven-year statutory maximum runs from the date of the final divorce decree rather than the date of the spousal maintenance memorandum.

17

hearing on June 2, 2020—the day the trial court entered its final divorce decree—and that before the court signed the decree, the parties' counsel made a handwritten change to the draft to reflect that Paul began making spousal maintenance payments on January 1, 2020. Before this change, the typewritten draft decree required Paul to make spousal maintenance payments from March 1, 2020, through February 28, 2027. According to Beverly, although counsel changed the start date from March 1 to January 1, neither the trial court nor counsel updated the end date accordingly. Beverly thus argues that the error is clerical rather than judicial and suggests that the appropriate remedy is a nunc pro tunc modifying the divorce decree to reflect an end date of December 31, 2026.[19] *See* Tex. R. Civ. P. 316, 329b(f); *see also Jordan-Nolan v. Nolan*, No. 07-12-00431-CV, 2014 WL 3764509, at *3 (Tex. App.—Amarillo July 28, 2014, no pet.) (mem. op.) (recognizing that "[a]ppellate courts have the power to reform whatever the trial court could have corrected by a judgment nunc pro tunc where the evidence necessary to correct the judgment appears in the record"); *cf. In re R.H.*, No. 02-20-00396-CV, 2021 WL 2006038, at *8 n.8 (Tex. App.—Fort Worth May 20, 2021, no pet.) (mem. op.) (modifying judgment to correct clerical errors).

We agree with the parties that the trial court abused its discretion by ordering spousal maintenance that remained in effect beyond the seven-year statutory

---

[19]Beverly does not ask us to remand the case for entry of a nunc pro tunc, nor does she ask us to modify the final divorce decree; she simply observes that, if the error in the decree was clerical, entry of a nunc pro tunc is the appropriate remedy.

maximum. *See* Tex. Fam. Code Ann. § 8.054(a)(1)(B). But, contrary to Beverly's contentions, the record does not indicate that this was a mere clerical error.

"A clerical error is one that results from an inaccurate recording of the court's decision" such that "the signed judgment inaccurately reflects the true decision of the court." *Andrews v. Koch*, 702 S.W.2d 584, 585–86 (Tex. 1986); *In re S.D.*, No. 02-10-00221-CV, 2011 WL 3847440, at *3 (Tex. App.—Fort Worth Aug. 31, 2011, no pet.) (mem. op.); *see Tex. Dep't of Transp. v. A.P.I. Pipe & Supply, LLC*, 397 S.W.3d 162, 167 (Tex. 2013). A judicial error, in contrast, "stems from a legal or factual mistake that requires judicial reasoning to correct." *In re J.S.*, No. 02-19-00231-CV, 2019 WL 5655254, at *3 (Tex. App.—Fort Worth Oct. 31, 2019, pet. denied) (mem. op.); *see Escobar v. Escobar*, 711 S.W.2d 230, 231 (Tex. 1986) (clarifying that "a clerical error [is one] made in *entering* final judgment" while "a judicial error [is one] made in *rendering* a final judgment"). "A judgment nunc pro tunc can correct a clerical error in the original judgment, but not a judicial one." *Tex. Dep't of Transp.*, 397 S.W.3d at 167; *see* Tex. R. Civ. P. 316, 329b(f) (providing that "the [trial] court may at any time correct a clerical error in the record of a judgment and render judgment nunc pro tunc under Rule 316"); *Escobar*, 711 S.W.2d at 231 (recognizing that after a trial court loses jurisdiction over a judgment, "it can correct only clerical errors in the judgment by judgment nunc pro tunc").

There is no record evidence that the trial court made a clerical error when it memorialized its December 2019 spousal maintenance order in the June 2020 final

19

divorce decree. We do not have a copy of the trial court's December 2019 spousal maintenance order, and as Paul points out, we do not have a reporter's record from the alleged June 2020 hearing at which Beverly claims the parties made a handwritten change to the divorce decree. The parties' attorneys both initialed the divorce decree next to their singular, handwritten change; neither they nor the trial court documented that any other modifications were necessary for the decree to accurately reflect the terms of the December 2019 spousal maintenance order.

The only record document authored or signed by the trial court confirming the end date for the spousal maintenance order is the final divorce decree. And that final divorce decree recognizes that the December 2019 spousal maintenance order required payments until February 28, 2027.[20] On its face, the final decree ordered

_____

[20]Before the trial court entered its final divorce decree, the parties each filed proposed decrees that they claimed memorialized the terms of the trial court's December 5, 2019 order. But the parties disagreed regarding the terms of the December 5, 2019 order, and their proposed decrees differed in several material respects, including the end date for Paul's spousal maintenance payments. Paul proposed a decree that ordered him to pay spousal maintenance "with the first payment being due on January 11, 2020, and a like amount being due on the 1st day of each month thereafter until . . . December 1, 2026 (ie. [sic] 7 years)," unless an alternative termination event occurred first. Beverly's proposed decree similarly began the spousal maintenance payments on January 11, 2020, it similarly required payments on the first day of each month, and it similarly provided for alternative termination events, but Beverly provided an end date of December 31, 2026.

The record does not indicate which party, if any, provided the draft decree that the trial court ultimately signed to authorize payments until February 28, 2027. Irrespective of who drafted this decree, though, the trial court's deviation from the parties' proposed start and end dates is notable, and absent evidence that this deviation was unintentional, we cannot assume as much.

maintenance for "more than . . . seven years after the date of the [December 2019] order." Tex. Fam. Code Ann. § 8.054(a)(1)(B). Beverly does not cite to anything in the record to support her representation that the end date reflected on the final divorce decree was a "scrivener's error." Absent evidence that the terms of the spousal maintenance order rendered in December 2019 differed from the terms subsequently memorialized in the final divorce decree, we cannot presume that the duration of the spousal maintenance order documented in this decree was a mere clerical error.[21] *See Deltuva v. Deltuva*, 113 S.W.3d 882, 888–89 (Tex. App.—Dallas 2003, no pet.) (op. on reh'g) (rejecting wife's argument that four-year duration of spousal maintenance order was a clerical error where the relevant statutory maximum was three years, but the wife did not direct the court to anything in the record demonstrating that error was typographical).

---

[21]Moreover, Paul filed his appellate brief—pointing out that the duration exceeded the statutory maximum—prior to our abatement of the case for entry of findings of fact and conclusions of law, but nothing in the supplemental record from the period of abatement indicates that the trial court believed the final divorce decree contained a clerical error. Nor does anything in the record indicate that Beverly requested a judgment nunc pro tunc or that the trial court entered one. *Cf. In re Elizondo*, 544 S.W.3d 824, 829 (Tex. 2018) (orig. proceeding) ("A trial court may correct clerical errors in a judgment even after its plenary power has expired.").

And although the trial court's findings of fact and conclusions of law find that Beverly is entitled to spousal maintenance "for the next seven years," the findings and conclusions were entered a year after the judgment, and they do not specify a start date or end date for the maintenance payments.

Furthermore, even if Beverly could point to record evidence to support her argument, and even if that argument successfully demonstrated that the divorce decree's February 28, 2027 spousal maintenance end date was a clerical error, we would still be forced to hold that the trial court abused its discretion. Beverly claims that the spousal maintenance period the trial court intended to document on the final divorce decree—i.e., the period the court originally specified in its December 5, 2019 memorandum—began on January 1, 2020, and ended on December 31, 2026. But the statutory seven-year cap runs from the date of the trial court's order—not the date of the first maintenance payment. Tex. Fam. Code Ann. § 8.054(a)(1)(B). The relevant seven-year period began on December 5, 2019, and the court could not "order maintenance that remain[ed] in effect for more than . . . seven years after the date of the order"—December 7, 2026. *Id.*; Tex. Gov't Code Ann. § 311.014. So if the trial court's December 5, 2019 order had specified an end date of December 31, 2026, as Beverly claims, the order would have remained in effect for seven years and twenty-six days. Again, this duration exceeds the applicable seven-year statutory maximum. Tex. Fam. Code Ann. § 8.054(a)(1)(B).

Thus, Beverly's nunc-pro-tunc argument merely reinforces our holding that the trial court abused its discretion by entering a spousal maintenance order that remained in effect for more than seven years after the date of the order. *See id.* We therefore reverse the order and remand for a new trial regarding the duration of spousal maintenance. *See Deltuva*, 113 S.W.3d at 888–89 (holding similarly).

22

### III. Conclusion

The trial court's spousal maintenance order exceeded the limitations of Texas Family Code Sections 8.054 and 8.055. The trial court abused its discretion by ordering Paul to pay $5,000 in monthly spousal maintenance without evidence that this amount was equal to or less than 20 percent of his average monthly gross income, Tex. Fam. Code Ann. § 8.055(a)(2), and it abused its discretion by ordering Paul to pay spousal maintenance for a period that extended more than seven years after the date of the trial court's order, *id.* § 8.054(a)(1)(B). We reverse the portions of the final divorce decree related to the amount and duration of spousal maintenance, and we remand for a new trial on those issues. Tex. R. App. P. 43.2(d); *see Evans*, 2020 WL 1808294, at *5; *Deltuva*, 113 S.W.3d at 888–89. We affirm all other aspects of the decree. Tex. R. App. P. 43.2(a).

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Delivered: January 20, 2022