

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 2-07-270-CV

GARY DEAN BROOKS                                                    APPELLANT

V.

DANA LEDON BROOKS                                                    APPELLEE

------------

FROM THE 271ST DISTRICT COURT OF WISE COUNTY

------------

## OPINION

------------

### Introduction

In this appeal, we determine whether a party to a mediated settlement agreement meeting the requirements of family code section 6.602 is estopped from enforcing the agreement after he has agreed to set it aside and go to trial. TEX. FAM. CODE ANN. § 6.602 (Vernon 2006).  In two issues, appellant Gary Dean Brooks contends that the trial court erred by failing to render judgment in accordance with the mediated settlement agreement and by awarding appellee

Dana Ledon Brooks spousal maintenance under family code section 8.053(b). *Id*. § 8.053(b).  We affirm.

## Background Facts

Appellant Gary Dean Brooks and appellee Dana Ledon Brooks were married for over thirty years.  On March 6, 2003, Dana filed for divorce; Gary answered and counterpetitioned for divorce on March 12, 2003.  On May 20, 2004, Dana and Gary entered into a mediated settlement agreement (MSA) dividing their property[1] in accordance with section 6.602 of the Texas Family Code.  The MSA was filed in the court record.  Both parties and their attorneys signed the agreement.

Over a year later, on November 15, 2005, Dana's and Gary's attorneys, but not Dana and Gary, signed a letter, which they also filed in the court record, stating, "Pursuant to our conversation today it is agreed that the mediated settlement agreement dated May 20, 2004 is void and this matter will be mediated again at a time mutually agreed upon by the parties and attorneys." The parties subsequently tried the case on December 18, 2006, over a year later.

---

[1] Although the couple had three children, none of them were minors at the time of the divorce.

At trial, both Gary and Dana presented proposed property divisions to the court for consideration, which were both admitted into evidence. They also stipulated that Gary's retirement benefits were separated into two tiers, that Tier 1 was an annuity that was not divisible, and that Gary would not interfere with any award of the divisible part (Tier 2) to Dana.

Dana testified first, asking the court (1) to sell a tract of real property on Eagle Mountain Lake that the couple owned and to give each of them one-half of the proceeds, (2) to award her one-half of the equity and mineral interest in the parties' residence, and (3) to divide Gary's Tier 2 retirement benefits equally because the parties had been married for all but one of the thirty-four years Gary has worked for Burlington Northern.[2] Dana also testified that at the time of trial she was fifty-two, was primarily a stay at home mother while the parties were married, and that she had worked for only about seven years during the marriage: as a receptionist, doctor's assistant, an auctioneer, and at a convenience store. Dana had only a high school diploma. Dana also testified that she had osteoporosis and disc problems with her back; she cannot work because the osteoporosis is so severe that she is at risk of breaking bones.

---

[2] This testimony is consistent with Dana's proposed property division, except that she asks for both properties to be sold and the proceeds to be divided equally between them.

3

Gary testified next on his own behalf. When asked whether he understood that a portion of his Tier 2 retirement benefit could be given to Dana, Gary answered, "Yes, I do." Gary never asked the judge not to award any retirement to Dana but merely asked him to take into consideration that she had lived away from him for nine years of the marriage.[3] He also asked the judge to award him the residence, including the debt on it, and all of the mineral interest associated with it. He wanted the Eagle Mountain Lake property to be awarded to Dana.

On February 16, 2007, before the decree was signed, Gary filed a motion for substitution of counsel, which the trial court granted. Gary's new counsel filed a motion for new trial, in which he contended that "[t]he mediated settlement agreement should have been the basis of the [trial] Court's ruling in this case," and that "there was no evidence or insufficient evidence for the [trial] Court to order maintenance to be paid . . . to Dana." The trial court heard and denied the motion on July 2, 2007. On July 10, 2007, the trial court signed a final decree. Gary timely filed a notice of appeal.

---

[3] In his proposed property division, under "Property to Wife," Gary listed "Spousal portion of railroad retirement benefits."

4

**Did Trial Court Have Duty to Render Judgment on MSA?**

In his first issue, Gary contends that the trial court erred by failing to render judgment in accordance with the parties' agreement in the MSA.

**Applicable Law**

Texas has a public policy of encouraging the peaceful resolution of disputes, particularly those involving the parent-child relationship, and the early settlement of pending litigation through voluntary settlement procedures. TEX. CIV. PRAC. & REM. CODE ANN. § 154.002 (Vernon 2005); *Boyd v. Boyd*, 67 S.W.3d 398, 402 (Tex. App.—Fort Worth 2002, no pet.). Trial and appellate courts are charged with the responsibility of carrying out this public policy. TEX. CIV. PRAC. & REM. CODE ANN. § 152.003 (Vernon 2005); *Boyd*, 67 S.W.3d at 402; *Adams v. Petrade Int'l, Inc.*, 754 S.W.2d 696, 715 (Tex. App.—Houston [1st Dist.] 1988, writ denied) (op. on reh'g). The Texas Family Code also furthers this policy by providing that a mediated settlement agreement is binding on the parties if the agreement

> (1) provides, in a prominently displayed statement that is in boldfaced type or capital letters or underlined, that the agreement is not subject to revocation;

> (2) is signed by each party to the agreement; and

> (3) is signed by the party's attorney, if any, who is present at the time the agreement is signed.

5

TEX. FAM. CODE ANN. §§ 6.602(b), 153.0071(d) (Vernon 2002 & Supp. 2007). Mediated settlement agreements are binding in suits affecting the parent-child relationship, as well as suits involving only marital property. *Id*. §§ 6.602(b)–(c), 153.0071(d)–(e); *Boyd*, 67 S.W.3d at 402; *Spinks v. Spinks*, 939 S.W.2d 229, 230 (Tex. App.—Houston [1st Dist.] 1997, no writ). Here, because there are no conservatorship and possession issues to be determined, only section 6.602 is applicable. *See Boyd*, 67 S.W.3d at 402.

Ordinarily, settlement agreements arising from mediation are not binding when one party timely withdraws consent to the agreement, unless the other party successfully sues to enforce the settlement agreement as a contract that complies with rule 11 of the Texas Rules of Civil Procedure. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 154.071(a) (Vernon 2005); *Padilla v. LaFrance*, 907 S.W.2d 454, 461–62 (Tex. 1995); *Boyd*, 67 S.W.3d at 402. Unilateral withdrawal of consent does not, however, negate the enforceability of a mediated settlement agreement meeting the requirements of 6.602(b), and a separate suit for enforcement of a contract is not necessary. *Boyd*, 67 S.W.3d at 402; *Alvarez v. Reiser*, 958 S.W.2d 232, 234 (Tex. App.—Eastland 1997, writ denied). Rather, section 6.602 creates a procedural shortcut for the enforcement of mediated settlement agreements in divorce cases. *Boyd*, 67 S.W.3d at 402; *Cayan v. Cayan*, 38 S.W.3d 161, 166 (Tex. App.—Houston

6

[14th Dist.] 2000, pet. denied). Thus, a mediated settlement agreement that meets the requirements of section 6.602(b) is binding, and a party is entitled to judgment on the agreement notwithstanding rule 11 or another rule of law. TEX. FAM. CODE ANN. § 6.602(b)–(c); *Boyd*, 67 S.W.3d at 402.

The phrase "notwithstanding rule 11 or another rule of law" does not, however, require a trial court to enforce a mediated settlement agreement simply because it complies with section 6.602(b), irrespective of what the agreement provides for or how it was procured. *Boyd*, 67 S.W.3d at 403. For example, a trial court may properly refuse to enforce a mediated settlement agreement that otherwise complies with section 6.602(b) if a party procures the agreement by intentionally failing to disclose material information. *See id*. at 404–05.

**Applicable Facts**

The parties did not rely on the MSA at the final divorce trial on December 18, 2006. In fact, it was not discussed nor was it admitted into evidence.

At the motion for new trial, Gary testified that he signed the MSA on May 20, 2004, that he did not know whether trial had proceeded on the MSA but he thought it did, and that he had seen a one-page letter purporting to be the

7

trial judge's ruling in the case and it did not follow the MSA.[4]  He then asked the trial court to set aside its letter ruling and enter a judgment based on the MSA.  However, Gary also testified that some of the real property[5] had already been divided and that Dana was paid $20,500 as a result.

On cross-examination, Gary admitted that at the mediation where the MSA was signed, he told the attorneys, based on information he received at two railroad retirement seminars, that his Tier 2 benefits were not divisible in a divorce.  When asked whether he had agreed to remediate, the following colloquy occurred:

| [Gary]: | . . . I've told y'all from the first I was willing to talk about anything. |
|---|---|
| . . . . | |
| [Dana's counsel]: | So you agreed?  You went back to the second mediation; is that correct?  You went back and we mediated this case again; is that correct? |
| [Gary]: | "Yes, ma'am, that is correct." |
| . . . . | |

---

[4] This letter is not included in the clerk's record.

[5] The proposed property distributions refer to the property on Eagle Mountain Lake; Gary referred to the property at the motion for new trial hearing as the Saginaw property.

[Dana's counsel]: So you did agree to go back to mediation to try to settle this case; is that correct?

[Gary]: Yes, ma'am, that is correct.

[Dana's counsel]: So you knew that this case was going to be not based on the prior Mediated Settlement Agreement?

[Gary]: No, ma'am, I didn't know that.

. . . .

[Dana's counsel]: Then why did you agree to go back to mediation to settle it?

[Gary]: Ma'am, I don't want - - I didn't want it to go to trial. I didn't want a bunch of accusations and everything brought out. I didn't want - - I wanted us - - I wanted us to just go our separate ways.

[Dana's counsel]: Okay. But you knew that that wasn't going to happen until we had an agreement on the case, isn't that correct, so that's why you mediated again? Didn't you know that - - your attorney told you we had to remediate this case, didn't he?

[Gary]: He said that y'all wanted to remediate. I said, "We'll talk. Let's go."

[Dana's counsel]: And you said okay?

[Gary]: Yes, ma'am, that's correct.

[Dana's counsel]: Okay. And then when we didn't settle it there, your attorney told you we had to have a trial, didn't he?

[Gary]:                        Yes, ma'am.

[Dana's counsel]:              And you came to trial, didn't you?

[Gary]:                        Yes, ma'am.

**Analysis**

Gary contends that neither the trial judge nor the attorneys were entitled to set aside the MSA because there is no evidence that he intentionally or fraudulently withheld information about the divisibility of his Tier 2 retirement benefits; he contends that an MSA is irrevocable regardless of the parties' mistaken beliefs as to the facts underlying the agreement. *See Cayan*, 38 S.W.3d at 166. However, we need not decide whether an otherwise irrevocable MSA under family code section 6.602 may be voided on mutual mistake grounds because we hold that, regardless of the enforceability of the MSA, Gary is estopped from seeking judgment in accordance with the terms of the MSA.

Quasi-estoppel precludes a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken. *Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 864 (Tex. 2000); *Atkinson Gas Co. v. Albrecht*, 878 S.W.2d 236, 240 (Tex. App.—Corpus Christi 1994, writ denied). The doctrine applies when it would be unconscionable to allow a person to maintain a position inconsistent with one to which he acquiesced,

10

or from which he accepted a benefit. *Lopez*, 22 S.W.3d at 864; *Atkinson Gas Co.*, 878 S.W.2d at 240; *Vessels v. Anschutz Corp.*, 823 S.W.2d 762, 765–66 (Tex. App.—Texarkana 1992, writ denied). Thus, quasi-estoppel forbids a party from accepting the benefits of a transaction or statute and then subsequently taking an inconsistent position to avoid corresponding obligations or effects. *Atkinson Gas Co.*, 878 S.W.2d at 240; *Mexico's Indus., Inc. v. Banco Mex. Somex, S.N.C.*, 858 S.W.2d 577, 581 n.7 (Tex. App.—El Paso 1993, writ denied); *Turcotte v. Trevino*, 499 S.W.2d 705, 712–13 (Tex. Civ. App.—Corpus Christi 1973, writ ref'd n.r.e.). Moreover, unlike equitable estoppel, quasi-estoppel requires no showing of misrepresentation or detrimental reliance. *Atkinson Gas Co.*, 878 S.W.2d at 240; *Vessels*, 823 S.W.2d at 765.

Here, Gary's position at trial was clearly inconsistent with his later position in his motion for new trial that the MSA was enforceable and that judgment should have been rendered in accordance with the MSA. Gary admitted that he agreed to remediate and that he knew he would have to go to trial if the second mediation failed. At trial, Gary presented his own proposed property division as evidence, which differed from the property division in the MSA. And Gary never objected at trial on the basis that Dana's proposed property division differed from the property division in the MSA. *See* TEX. R.

11

APP. P. 33.1(a)(1) (requiring that objection in trial court be timely); TEX. R. EVID. 103; *Bushell v. Dean*, 803 S.W.2d 711, 712 (Tex. 1991) (op. on reh'g); *Hoxie Implement Co. v. Baker*, 65 S.W.3d 140, 145 (Tex. App.—Amarillo 2001, pet. denied) (holding that objection is considered timely if asserted when the potential error becomes apparent). In addition, according to Gary's own testimony, by the time the motion for new trial was heard, the Eagle Mountain Lake property had already been sold, and the parties had divided the proceeds equally.[6]

Moreover, a trial court judgment in accordance with the MSA would be to Dana's disadvantage because she would lose her equity in the parties' residence—which is greater than Gary's share of the equity in the Eagle Mountain Lake property—as well as her court-ordered spousal support. Additionally, the MSA is unclear on the division of Gary's retirement benefits, stating that Gary is entitled to "[a]ll of his portion of the railroad retirement" and that Dana is entitled to the "[s]pousal portion of railroad retirement benefits as provided by law." In contrast, the divorce decree awards Dana one-half of the Tier 2 benefits. For these reasons, we conclude and hold that it would be

---

[6] Although Gary states in his brief that he obviously wanted to enforce the MSA, the only evidence in the record is that he did not want to enforce it until the trial court indicated that it would enter a decree that was not as advantageous to him.

12

unconscionable to allow Gary to enforce the MSA after taking the clearly inconsistent position that it is unenforceable by participating in a second mediation and in trial and proposing his own property division at trial that differs from the terms of the MSA.[7] We overrule Gary's first issue.

## Did Trial Court Properly Award Spousal Maintenance to Dana?

In his second issue, Gary claims that the trial court erred in awarding Dana spousal maintenance based on her testimony that she suffered an incapacitating physical disability. According to Gary, Dana's testimony alone — without any supporting medical records — is insufficient to support the trial court's finding that she has an incapacitating physical disability.

### Applicable Law and Standard of Review

When a marriage has lasted ten years or more, a spouse in a divorce proceeding is eligible to seek spousal maintenance if that spouse lacks sufficient property to meet minimum reasonable needs and cannot support herself due to an incapacitating physical or mental disability. *See* TEX. FAM. CODE ANN. § 8.051(2)(a) (Vernon 2006); *In re Green*, 221 S.W.3d 645, 647 (Tex. 2007);

---

[7] After hearing the motion for new trial, the trial court concluded, "I'll deny the Motion for New Trial both because, number one, . . . we went to trial with two attorneys, same attorneys representing them when mediated and signed. . . . And *with the approval of the parties*, we all went to trial on it [the divorce] with both parties and the same attorneys." [Emphasis added.]

*Hackenjos v. Hackenjos*, 204 S.W.3d 906, 908–09 (Tex. App.—Dallas 2006, no pet.).

Section 8.054(a)(1) of the Texas Family Code generally limits a trial court's award of spousal maintenance to no more than three years. *See* TEX. FAM. CODE ANN. § 8.054(a)(1); *In re Green*, 221 S.W.3d at 647; *Hackenjos*, 204 S.W.3d at 909; *Crane v. Crane*, 188 S.W.3d 276, 279 (Tex. App.—Fort Worth 2006, pet. denied). But under section 8.054(b), if the spouse seeking maintenance is unable to support herself through appropriate employment because of an incapacitating physical or mental disability, the trial court may order spousal maintenance for an indefinite period of time as long as the disability continues. TEX. FAM. CODE ANN. § 8.054(b); *In re Green*, 221 S.W.3d at 647; *Hackenjos*, 204 S.W.3d at 909; *Crane*, 188 S.W.3d at 279. Additionally, section 8.056 provides that the obligation to pay future maintenance terminates on the death of either party, the remarriage of the obligee, or if, after a hearing, the trial court determines that the obligee "cohabits with another person in a permanent place of abode on a continuing, conjugal basis." TEX. FAM. CODE ANN. § 8.056; *In re Green*, 221 S.W.3d at 647; *Hackenjos*, 204 S.W.3d at 909.

A trial court's award of spousal maintenance is subject to an abuse of discretion review. *Chafino v. Chafino*, 228 S.W.3d 467, 474 (Tex. App.—El

14

Paso 2007, no pet.); *Pickens v. Pickens*, 62 S.W.3d 212, 214 (Tex. App.—Dallas 2001, pet. denied). The trial court may exercise its discretion to award spousal maintenance if the party seeking maintenance meets specific eligibility requirements. *Crane*, 188 S.W.3d at 278; *Pickens*, 62 S.W.3d at 214–15. Under the abuse of discretion standard, legal and factual sufficiency of the evidence are not independent grounds for asserting error, but they are relevant factors in assessing whether the trial court abused its discretion. *Dunn v. Dunn*, 177 S.W.3d 393, 396 (Tex. App.—Houston [1st Dist.] 2005, pet.denied); *Pickens*, 62 S.W.3d at 214.

**Applicable Facts**

Here, the trial court awarded indefinite maintenance under section 8.054(b), subject only to the statutory limitations set forth in section 8.056. Dana did not introduce any medical records into evidence, nor did she offer any expert testimony at trial. However, she did testify that her health started deteriorating about three years before trial and that she had three discs on her back "that were out." She began taking epidural steroid injections, which she takes every six months for about six weeks. The injections affect her ability to work. In addition, while she was being treated for her back, she had a bone density test that revealed osteoporosis. According to Dana, the osteoporosis prevents her from working because her bones are "so brittle that . . . if [she]

15

step[s] wrong, [she] can break [her] back . . . leg . . . [or] foot." She has trouble with the medications used to treat osteoporosis. In addition, the doctors had discovered a mass on her right hip, and she was awaiting the MRI results. Dana testified that her parents had supported her for the past six years before trial, while she was living apart from Gary, and that her only job during that time was assisting an elderly woman with running errands and going to the doctor.

**Analysis**

Gary contends that there is insufficient medical evidence to support the trial court's finding that Dana suffers from an incapacitating physical disability. In *Pickens v. Pickens*, the Dallas Court of Appeals held that

> testimony on incapacity need not be limited to experts; a fact finder may reasonably infer incapacity from circumstantial evidence or the competent testimony of lay witnesses. The question of the extent and duration of incapacity is an issue that can be answered by lay opinion and does not require medical testimony. In fact, the testimony of the injured party will support a finding of incapacity even if directly contradicted by expert medical testimony.

62 S.W.3d at 215–16 (citations omitted). Gary acknowledges this holding in *Pickens* but contends that the case is distinguishable because there was medical evidence in that case supporting the trial court's ruling. We disagree.

In *Lopez v. Lopez*, the Corpus Christi Court of Appeals held that the trial court did not abuse its discretion in awarding spousal support for an

incapacitating disability—diabetes—based on the testimony of the wife even though the husband testified that he did not think his wife's diabetes was incapacitating. 55 S.W.3d 194, 199 (Tex. App.—Corpus Christi 2001, no pet.). And in *Smith v. Smith*, the same court, relying on *Pickens*, held that the trial court did not abuse its discretion in awarding spousal maintenance based on the husband's testimony that an aneurysm had left him incapacitated, despite the wife's testimony that she did not think the disability was incapacitating. 115 S.W.3d 303, 308–09 (Tex. App.—Corpus Christi 2003, no pet.). We agree with the holding and reasoning of these courts. Accordingly, we conclude and hold that there is sufficient evidence to support the trial court's conclusion that Dana's disability is incapacitating and, thus, that the trial court did not abuse its discretion in awarding her monthly spousal maintenance. We overrule Gary's second issue.

### Conclusion

Having overruled Gary's two issues, we affirm the trial court's judgment.

TERRIE LIVINGSTON
JUSTICE

PANEL B: LIVINGSTON, HOLMAN, and GARDNER, JJ.

DELIVERED: June 5, 2008