

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-22-00001-CV

———————————————

NANCY BOUAJRAM, Appellant

V.

RAMI BOUAJRAM, Appellee

On Appeal from the 467th District Court
Denton County, Texas
Trial Court No. 18-5868-211

Before Birdwell, Bassel, and Wallach, JJ.
Memorandum Opinion by Justice Wallach

## MEMORANDUM OPINION

Nancy Bouajram and Rami Bouajram both appeal from the trial court's divorce decree. The trial court signed its original divorce decree in October 2020, but after a new-trial order and a successful mandamus proceeding brought by Rami, the trial court signed the corrected final decree (the Corrected Decree) from which the parties appeal. Nancy challenges the Corrected Decree's adoption of the couple's mediated settlement agreement (MSA). Rami's appeal asserts one issue in two parts; one part challenges the Corrected Decree's language regarding the treatment of the parties' pre-divorce federal income taxes, and the other part challenges the Corrected Decree's recital of values for some of the property allocated to Rami. Because we hold that the MSA is enforceable, that the Corrected Decree should have included the income tax term requested by Rami, and that Rami did not preserve his valuation argument for appeal, we will affirm in part and reverse in part.

### Background

Nancy filed for divorce in July 2018. In April 2019, the parties signed a "Partition or Exchange Agreement" (the partition agreement or PEA). Under that agreement, the parties partitioned some of their community property into separate property. In October 2019, the parties attended mediation, but it concluded without a settlement.

Rami filed a counterpetition in January 2020. On February 6, 2020, the parties and their attorneys appeared at court for a hearing. Shortly before that hearing, the

parties negotiated some changes to a draft MSA,[1] which they then signed. The MSA was filed with the clerk that same day.

The MSA had two distinct parts. The first part (Part I) began with an introduction and was followed by seven sections over eight pages. At a status hearing later in the case at which the parties discussed their objections to the proposed Corrected Decree, they referred to Part I as "the boilerplate"; this part of the MSA contained generic terms that did not address any specific property of the parties. For example, it contained a section in which the parties agreed that their community property would be divided in accordance with a spreadsheet that had been attached to the MSA as Exhibit 1, but Part I did not discuss or refer to any of the specific property listed in Exhibit 1.

In another section of Part I, each party made representations that the party had made a full and fair disclosure of all their assets and liabilities, that any mistakenly omitted assets or liabilities not described in the agreement would be subject to future division by the court, and that "[a]ny undivided community assets later determined to have been fraudulently undisclosed by a party in [the agreement] are hereby partitioned 100% to the other party, and the Decree will so provide." Another section

---

[1]Nancy's brief states that Rami brought the draft agreement with him to court that day. *See* Tex. R. App. P. 38.1(g) ("In a civil case, the court will accept as true the facts stated [in the appellant's brief] unless another party contradicts them.").

stated that the agreement superseded all prior marital property agreements between the parties.

The second part of the MSA (Part II) was entitled "Further Agreements." As suggested by its title, this part of the MSA contained additional, more specific provisions relating to the parties' property division and to child custody issues. It also specifically addressed the PEA: "Marital Property Agreement dated 4/25/19: The agreement is null and void. Neither party will seek to enforce the terms of the Agreement."

In June 2020, Rami filed a motion to divide undivided assets and, alternatively, a motion to reopen evidence[2] because, among other grounds, he had not disclosed several business entities that he had created. He had provided the formation documents for some of the entities to Nancy in discovery responses two days before the hearing that resulted in the MSA, but the existence of others had not been disclosed until after the MSA's signing. Rami contended that the lack of disclosure was unintentional and that he had not yet used any of the entities.

A week later, Rami filed a second amended motion to divide undivided assets. On the same day, Nancy filed a motion to set aside the MSA based on these and other alleged nondisclosures or misrepresentations by Rami regarding the parties' community property. She stated that she had discovered the omitted entities only by

_____

[2]The motion's title indicates that it was an amended motion, but the original motion does not appear in the appellate record.

reading the draft decree that Rami's attorney had prepared. At a September 2020 hearing, the trial court denied Nancy's motion to set aside the MSA, but the court ordered that the decree include the language from Part I of the MSA regarding the parties' representations about omitted property.

In October 2020, the trial court signed the original decree. Nancy filed a motion to modify the judgment, a motion to vacate the decree, and a motion for new trial. In her new-trial motion and at the hearing on the motion, Nancy asserted that Rami had omitted from the MSA's Exhibit 1 the accounts receivables for Hospital Medical Management Services, LLC (HMMS), an entity that was allocated to Rami in the MSA. Nancy claimed that in August 2020, after the trial court had reopened discovery, she received data from the software service used by HMMS, and that data was evidence that HMMS had receivables that Rami had not reported; Exhibit 1 had listed multiple assets and liabilities of HMMS, but the list did not include receivables. Nancy also asserted that the draft decree that Rami had provided to the trial court left out the MSA language about omitted property that the court had ordered included.

After a hearing, the trial court signed an order granting a new trial, setting aside the MSA, and finding that newly discovered evidence had come to Nancy's knowledge since the MSA's execution. However, the trial court crossed out proposed language in the order that would have found that Rami's failure to disclose assets was fraudulent. Accordingly, in a mandamus proceeding, this court granted relief for Rami and ordered the trial court to vacate the new-trial order and to reinstate the MSA. *In re*

5

*Bouajram*, No. 02-21-00072-CV, 2021 WL 3673856, at *4, *5 (Tex. App.—Fort Worth Aug. 17, 2021, orig. proceeding) (mem. op.) (noting that the trial court had crossed out a proposed fraud finding and declining on that basis to apply this court's precedent that an MSA may be set aside if procured by fraud or other dishonest means); *see also* Tex. Fam. Code Ann. § 6.602 (providing that parties are entitled to judgment on MSA that meets statute's requirements).

While the mandamus proceeding was pending, the case was transferred to the 467th District Court.[3] After this court's disposition of the mandamus proceeding, the new trial court signed an order vacating the new-trial order and reinstating both the MSA and the original divorce decree. In response, Nancy filed a supplemental motion to modify the judgment. After a hearing, the trial court signed a memorandum ruling finding that the award of property in the reinstated decree did not conform with the MSA and that the decree should thus be corrected to identify the assets awarded to each party.

The trial court then held a status hearing for the parties to address their objections to a proposed decree—the hearing at which the parties referred to Part I of the MSA as "the boilerplate." At the hearing, each party's attorney told the trial court that certain tax language in the MSA should not be included in the decree because

---

[3]Before granting mandamus relief, we first abated the mandamus proceeding for the judge of the 467th District Court to consider the new-trial order. *See In re Blevins*, 480 S.W.3d 542, 543 (Tex. 2013) (orig. proceeding).

6

more specific tax language elsewhere in the MSA controlled. However, after the trial court signed the Corrected Decree, which left out the language that the attorneys for both parties had said should be omitted, Rami's attorney filed a motion to modify the judgment to include the omitted language. The trial court denied the motion. Both parties then appealed.

## Nancy's Appeal

Nancy's appellate issues are all based on her contention that after the partition agreement converted some of the couple's community property into separate property, the MSA then converted some of that separate property back into community property without including the statutory disclosure that must be provided when converting separate property to community property. Nancy argues in her first issue that the MSA improperly divested her of her separate property rights without disclosing the effects of the agreement. In her second issue, Nancy contends that (1) Rami failed to show that she had waived her rights under the partition agreement and (2) because she was not made aware of her right to understand the effects of the MSA on her separate property, she could not have waived that right. In her third issue, Nancy argues that even under an MSA, a party cannot waive a mandatory Family Code provision; thus, the trial court had no discretion to render judgment on the MSA that violated the mandatory Family Code provision requiring disclosure of the agreement's effects.

## I. Nancy's Arguments and Applicable Law

Texas law presumes that property possessed by either spouse during or on dissolution of a marriage is community property, but the Family Code allows spouses to partition their community property into separate property. Tex. Fam. Code Ann. §§ 3.003, 4.102. Nancy and Rami did just that in 2019 by executing the partition agreement. The PEA partitioned HMMS to Rami as his separate property; in exchange, Rami agreed to pay Nancy $8,500 a month for 144 months. The PEA partitioned the couple's marital residence to Nancy as her separate property, and Rami agreed to be solely liable for paying the existing indebtedness on the property. Thus, at that point, as a result of the PEA, HMMS and the marital residence would have been no longer subject to a trial court's "just and right" division of property in the couple's divorce proceeding. *See Boyd v. Boyd*, 67 S.W.3d 398, 406 (Tex. App.—Fort Worth 2002, no pet.) (noting that a spouse's separate property is not subject to just and right division by trial court). Additionally, the PEA made Rami solely responsible for "any and all pending federal income tax liabilities of the parties," and he agreed to pay any losses or penalties incurred by Nancy resulting from a "Federal Tax Audit or other litigation surrounding taxes owed by the parties prior to May 1, 2019." The PEA further stated that it could be "waived, abandoned, modified, amended, discharged, or terminated only by a written instrument signed by both parties that specifically identifie[d] the waiver, abandonment, modification, amendment, discharge, or termination."

8

In addition to authorizing partitions of community property into separate property, Texas law also allows spouses to convert their separate property into community property. Tex. Fam. Code Ann. § 4.203. Merely transferring a spouse's separate property to the name of the other spouse or to the name of both spouses is insufficient to convert the property to community property. Tex. Fam. Code Ann. § 4.203(b). Like a partition agreement, an agreement converting separate property (a conversion agreement) must be in writing. *Id.* Additionally, the conversion agreement must disclose to the affected party the legal effect of converting the separate property to community property. *Id.* §§ 4.203, .205; *see Robertson v. Robertson*, No. 13-14-00523-CV, 2015 WL 7820814, at *6 (Tex. App.—Corpus Christi–Edinburg Dec. 3, 2015, no pet.) (mem. op.) (noting that the Family Code requires that a conversion agreement include disclaimers identifying the consequences of the agreement). A conversion agreement is unenforceable if one of the parties proves that the party did not receive a fair and reasonable disclosure of the agreement's legal effect. Tex. Fam. Code Ann. § 4.205(a).

Nancy argues that because the MSA divided some property that the PEA had already partitioned to her as her separate property, the MSA acted as a conversion agreement. She further argues that because the MSA was a conversion agreement but did not contain the statutorily-required disclosure about its legal effect, the MSA is unenforceable to the extent that it affects the separate property awarded to her under the PEA. She contends that this is so even if the MSA otherwise complied with

9

Section 6.602, a Family Code provision regarding MSAs in the divorce context. That section provides that if an MSA meets the section's requirements, "a party is entitled to judgment on the [MSA] notwithstanding Rule 11, Texas Rules of Civil Procedure, or another rule of law." *Id.* § 6.602. As Nancy points out, despite the "notwithstanding" language, several appellate courts have held that an MSA under the Family Code may not contract around the Family Code's mandatory venue statute. *See, e.g., In re Mathes*, Nos. 03-20-00379-CV, 03-20-00441-CV, 2020 WL 7063684, at *2 (Tex. App.—Austin Dec. 3, 2020, orig. proceeding) (mem. op.); *In re Lovell-Osburn*, 448 S.W.3d 616, 620 (Tex. App.—Houston [14th Dist.] 2014, orig. proceeding). Nancy argues that like the venue provision, the requirement to disclose a conversion agreement's legal effect is also mandatory, and therefore an MSA may not avoid complying with it. Thus, she contends, the parts of the MSA that conflict with the PEA are unenforceable for failing to satisfy that requirement.

## II. Analysis

For purposes of resolving Nancy's appeal, we make three assumptions, each limited to this case. First, we accept both parties' assertion that the MSA is in fact a mediated settlement agreement, despite the suggestion in the record that parts of the agreement were negotiated among the spouses and their attorneys at the courthouse on a hearing date rather than during mediation. *See Lee v. Lee*, 158 S.W.3d 612, 614 (Tex. App.—Fort Worth 2005, no pet.) (holding that an MSA "necessarily requires mediation and a mediator," and thus a settlement agreement entered into by

10

divorcing parties without the involvement of a third-party mediator is not an MSA

under Family Code Section 6.602). Second, we assume that Nancy did not waive her

issues.[4] Third, we accept Nancy's contention that the MSA is a conversion agreement.

Rami argues that the MSA's inclusion of separate property in the property

division is not sufficient on its own for the MSA to constitute a conversion agreement

because a spouse may bargain away separate property as part of an MSA.[5] *See Moore v.*

*Moore*, No. 01-11-00163-CV, 2011 WL 6147771, at *5 (Tex. App.—Houston [1st

Dist.] Dec. 8, 2011, no pet.) (mem. op.); *Cayan v. Cayan*, 38 S.W.3d 161, 166 (Tex.

App.—Houston [14th Dist.] 2000, pet. denied). However, we need not consider that

argument because even assuming for purposes of this opinion that the MSA is a

---

[4]Among other arguments, Rami asserts that by signing an agreement that negated the PEA, Nancy waived her statutory right to the disclosure about the legal effects of the agreement. We decline to hold that a party waives the right to mandatory disclosures merely by signing an agreement that omits them. *See* Tex. Fam. Code Ann. § 4.205(a). Rami also argues that the law of the case doctrine prevents consideration of Nancy's issues, but the previous mandamus proceeding brought by Rami considered only whether the dishonest-behavior exception applied to make the MSA void in its entirety. *See Bouajram*, 2021 WL 3673856, at *4–5. We were not asked to consider the effect, if any, that Sections 4.203 and 4.205 had on the enforceability of some parts of the MSA. *See Briscoe v. Goodmark Corp.*, 102 S.W.3d 714, 716 (Tex. 2003) (discussing application of law of the case doctrine).

[5]Rami does not address the effect that the MSA's revocation of the PEA has on the character of the property that became separate property only because of the PEA. Rami also does not address the MSA's referring to the property divided within it as community property or the MSA's use of the word "partition" to refer to the agreement's division of property. However, we need not determine whether that language is sufficient to show that the MSA is a conversion agreement, as opposed to an agreement in which the parties conveyed away some separate property, because we may dispose of the appeal by assuming that the MSA is a conversion agreement.

11

conversion agreement, under the limited facts of this case, we reject Nancy's challenges to the agreement. As we discuss next, we agree with Rami that to the extent that the MSA converts separate property to community property and divides it as such, it satisfies statutory requirements. In this case, Nancy has not shown that she did not receive a fair and reasonable disclosure as to the MSA's legal effect. *See* Tex. Fam. Code Ann. § 4.205(a) (putting burden on party resisting enforcement of conversion agreement to show lack of fair and reasonable disclosure).

As Rami points out, the MSA listed the property that it divided and stated that as of the agreement's date, the property would be the separate property of the spouse to whom it had been allocated. The MSA also stated that for the property awarded to Rami as his separate property, Nancy was divested of all right, title, and interest in and to that property as of the MSA's date and that unless otherwise provided, "all income and bonuses of [Rami]'s and all income arising from th[at] property and benefits set aside to [him] in this [MSA]" would also be Rami's separate property. The MSA had the same provisions regarding the property that it allocated to Nancy. Additionally, the MSA allocated some debts to Nancy as of the MSA's date and some debts to Rami, and it provided that Nancy would pay the debts allocated to her and that Rami would pay the debts allocated to him. Finally, the MSA expressly voided the PEA— the very agreement that partitioned to Nancy the separate property that she claims here. The PEA contemplated that it could be terminated or abandoned by a subsequent written agreement, so long as the subsequent agreement specified the

12

termination or abandonment, and the MSA did just that. Although the MSA does not use the word "convert" or "conversion," under the specific facts of this case, the MSA provided a fair and reasonable disclosure of its legal effect. *Cf. Alonso v. Alvarez*, 409 S.W.3d 754, 758 (Tex. App.—San Antonio 2013, pet. denied) (upholding trial court finding that marital agreement was a conversion agreement under Section 4.203 even though it did not use the word "conversion").

Nancy argues that Family Code Section 4.205 "goes out of its way to define 'fair and reasonable disclosure'" and that the MSA does not satisfy that standard. She refers to language in Section 4.205 that, when included in a conversion agreement, creates a rebuttable presumption that the parties received a fair and reasonable disclosure. *See* Tex. Fam. Code Ann. § 4.205(b). However, Section 4.205 does not state that the sample language in the statute is the *only* way to provide a fair and reasonable disclosure. Nancy contends that the MSA did not inform her that it would divest her of her separate property, but the MSA specifically advised Nancy that as of its execution date, Nancy was divested of all right, title, and interest in and to the property that had been allocated to Rami in the MSA. We hold that under the specific facts of this case, the parties' MSA provided a fair and reasonable disclosure of its legal effects as to the parties' separate property.

Nancy relies on *Lachica v. Medina*, 657 S.W.3d 829, 836 (Tex. App.—El Paso 2022, no pet.), and *In re Estate of Cunningham*, 390 S.W.3d 685, 688 (Tex. App.—Dallas

2012, no pet.), to argue that to the extent that the MSA conflicts with the PEA, it is unenforceable. Both cases are distinguishable.

In *Lachica*, the divorcing spouses had executed a marital property agreement under which multiple accounts were partitioned as the wife's separate property. 657 S.W.3d at 832. Later, in divorce proceedings, the couple executed a settlement agreement—though not a mediated settlement agreement—that addressed the division of the couple's real and personal property and shared debts. *Id.* Both spouses subsequently repudiated the settlement agreement. *Id.* at 837. On appeal, the husband complained that the trial court had failed to include the previously-partitioned accounts in its division of community property and had improperly found that the accounts were the wife's separate property. *Id.* at 835–36. The husband asserted that the settlement agreement, although repudiated, had nevertheless converted the partitioned separate property back into community property. *Id.* at 836.

The appellate court overruled the husband's contentions because, even if a repudiated settlement agreement *could* have that effect, the repudiated agreement (1) contained no language revoking the parties' prior partition agreement and (2) did not meet the requirements of Section 4.203 because it never identified the property being converted or specified that it was being converted to community property. *Id.* at 837. The court further noted that the settlement agreement never even referred to any property as "separate" or "community." *Id.* The MSA here presents a different

14

situation. The MSA specifically terminated the PEA, and as we have discussed, it satisfies Section 4.203.

In *Cunningham*, the spouses had used a fill-in-the-blank form entitled "Agreement to Establish Right of Survivorship to Community Property between Spouses"; the form stated that its purpose was to allow the spouses to agree that on the death of one spouse, the couple's community property would pass to the surviving spouse. 390 S.W.3d at 688. On the form, the spouses listed one property as their community property. In a proceeding after the husband's death, the trial court found that the agreement complied with Section 4.203 and had converted all the husband's separate property into community property. *Id.* at 687.

On appeal, the Dallas Court of Appeals agreed with the husband's son that the agreement did not satisfy Section 4.203. *Id.* at 688. The court noted that the agreement listed only one specific property, stated that its purpose was for the spouses to agree that their community property would be passed on the death of one spouse to the surviving spouse, and did not state that the spouses were agreeing to convert the husband's separate property into community property. *Id.* Further, the wife acknowledged that there had been no disclosure of the effect of converting the husband's separate property. *Id.* at 688–89. Here, the MSA listed the property affected by the agreement and informed the parties that as of the agreement's date, the property allocated to each spouse was that spouse's separate property and the other spouse was divested of all right, title, and interest in and to that property.

15

Nancy further argues that the MSA did not inform her of its legal effects because "[t]he MSA made no reference to any community buy-out of [her] interest in HMMS[,] and so she lost $1,232,500 previously awarded to her [in the PEA] as her separate property for this interest." But the MSA made clear that HMMS would become Rami's separate property under the agreement, that Nancy would lose any interest in the entity, and that the PEA was revoked. Under the facts of this case, the MSA satisfied statutory requirements and provided Nancy with a full and fair disclosure of its legal effect regarding the property that had been partitioned to her and to Rami under the PEA. We overrule Nancy's first issue.

In Nancy's second issue, she challenges the trial court's finding that by executing the MSA, she had waived her right to enforce the PEA. Under this issue, she contends that Rami failed to plead waiver as an affirmative defense and that the record does not establish waiver. She asserts that the trial court's finding that she waived the PEA "misses the point entirely" because her argument "was not for the enforcement of the PEA but that the MSA was void to the extent it sought to convert separate property into community property without sufficient warnings required under the Family Code." She then argues that she could not have waived her right to understand the MSA's effects when the MSA did not make her aware of that right. Our disposition of Nancy's first issue moots this issue.

Also moot is Nancy's third issue, which asserts that the trial court had no discretion to render judgment on an MSA that violated the public policy that parties

16

must be fully informed of the effect of a transfer of separate property to community property. As we held above, the MSA sufficiently informed Nancy of its legal effect regarding property that had been partitioned to her and Rami under the PEA. Nancy makes no argument that a conversion agreement that complies with Section 4.203 nevertheless violates public policy. Accordingly, we overrule Nancy's second and third issues.

## Rami's Appeal

In Rami's sole issue, he contends that the trial court erred by signing the Corrected Decree because it does not conform to the MSA. Under this issue, he complains about two separate provisions of the decree.

## I. Tax Liability and Indemnification Language

In the first part of Rami's issue, he complains that the Corrected Decree does not contain the MSA's "explicit provisions as to the dividing [of] the parties' pre-December 31, 2019 tax liability and indemnification." This argument challenges the exclusion from the Corrected Decree of some tax-liability language contained in the MSA.

### A. Background

The MSA had two provisions regarding the parties' federal tax liabilities. First, Part I of the MSA had a section stating that each spouse would equally split any income tax refund resulting from the couple's taxes through the end of 2019, that each spouse would be responsible for half of all the couples' federal income tax

liabilities through the end of 2019, and that each spouse would hold the other party harmless from half of any liabilities (the indemnification term). Second, Part II of the MSA had a section that stated, "Income Taxes due for 2018 and 2019: According to IRS rules and regulations" (the IRS regulations term). The Corrected Decree omitted the indemnity term; the trial court signed the Corrected Decree after each party's attorney told the court that the IRS regulations term controlled over the indemnity term.

The attorneys made these representations at the status hearing at which the parties made their objections to the proposed corrected decree. There, the trial court asked the attorneys why they had removed the indemnification term. Rami's attorney responded that she agreed with Nancy's attorney that the IRS regulations term from Part II was the more specific provision and prevailed over the indemnification term in Part I.

> THE COURT: Why did all the rest of the tax language go?
>
> [Rami's attorney]: So in summary, Judge, there was only one line in the MSA addressing the taxes and it was only for years 2018 and 2019. When I included—when I drafted this, I included—well, actually, I take that back. [Nancy's attorney] included 2020 when he sent it to me, but there were no provisions made whatsoever anywhere for 2020 taxes, and [Nancy's attorney] and I both agreed to that, so we just removed that language.
>
> THE COURT: Right. I see that, but there was language with regard to income taxes prior to 2019. Was that accepted or deleted or what?

[Rami's attorney]: Yes, because there was—[Nancy's attorney] and I *both agreed that the specific language of the MSA* [i.e., Part II] *controls* the general language in the boilerplate [i.e., Part I]. So *the MSA itself* [Part II] *just had one line.* I do agree with you; I would prefer to have the full language that we deleted. I think that's actually the appropriate thing to do under the circumstances.

THE COURT: But the MSA has more than one line on page 4.

[Rami's attorney]: In the boilerplate, yes.

THE COURT: Oh, gotcha. Okay.

[Rami's attorney]: Yeah, in the boilerplate.

THE COURT: Gotcha.

[Rami's attorney]: And *we made a specific provision* addressing those outside that. So, unfortunately, I think we're sort of stuck with the specific over the general thing. [Emphasis added.]

In other words, according to Rami's attorney, although she would have liked the indemnity term to be included, the indemnity term was in Part I, which was "the boilerplate," and the IRS regulations term was the more specific term. Her reference to Part I as "the boilerplate" and to Part II as "the MSA itself" was some indication that, at least in her understanding, Part II contained the terms of the MSA that the parties had negotiated as to their specific property (and children), whereas Part I contained the MSA's more standardized terms. However, Rami's attorney also noted that her client nevertheless wanted the indemnity term to be included in the decree:

[Rami's attorney]: I will say, Judge, that my client would like that language from the MSA to be included with regard to the taxes. So we would ask that you make a ruling related to the tax language as to

19

whether the 2018 or 2019 language controls or the whole boilerplate controls in this case.

The trial court ruled that the IRS regulations term controlled.

After the trial court signed the Corrected Decree, which included only the IRS regulations term, Rami's attorney filed a motion to modify the decree to include the indemnification term. At the hearing on the motion, his attorney argued that the indemnification term was the more specific language because the IRS regulations term was "incredibly general." She further asserted that the indemnity term should control because it appeared earlier in the MSA. The trial court denied the motion.

## B. Relevant Authority

When parties reach a settlement agreement, the final judgment must comply with that agreement. *Glynn v. Glynn*, 651 S.W.3d 348, 354–55 (Tex. App.—Houston [1st Dist.] 2022, no pet.) (observing that a divorce decree based on an MSA may adopt mechanisms to enforce the parties' agreement but must not add terms that significantly alter the MSA's original terms). A judgment that improperly removes or adds material terms to a settlement agreement does not comply with the agreement. *Chisholm v. Chisholm*, 209 S.W.3d 96, 98 (Tex. 2006). Courts determine material terms on a case-by-case basis. *Fischer v. CTMI, L.L.C.*, 479 S.W.3d 231, 237 (Tex. 2016); *see Glynn*, 651 S.W.3d at 354.

We apply general contract-interpretation principles when construing an MSA. *Loya v. Loya*, 526 S.W.3d 448, 451 (Tex. 2017). When a contract is not ambiguous, the

20

trial court must look to the contract's language to determine as a matter of law the parties' intent as expressed in the contract. *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003); *see also Loya*, 526 S.W.3d at 451. We examine the entire agreement to harmonize its provisions, and we consider each provision in the context of the whole agreement. *Austin Tr. Co. as Tr. of Bob & Elizabeth Lanier Descendants Trs. for Robert Clayton Lanier, Jr. v. Houren*, 664 S.W.3d 35, 42 (Tex. 2023).

With respect to particular terms, "a specific contract provision controls over a general one." *Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 889 (Tex. 2019) (citing *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 134 (Tex. 1994)). Further, an agreement's mere reference to a certain set of rules does not bind the parties to those rules, but when the agreement expressly states that a term of the agreement must be performed "in accordance with" a set of rules, the agreement incorporates those rules. *TotalEnergies E&P USA, Inc. v. MP Gulf of Mexico, LLC*, 667 S.W.3d 694, 709 (Tex. 2023).

**C. Analysis**

Rami argues that the two tax terms may be harmonized because the IRS regulations term "in no way, shape, or form is in discord with" the indemnity term. However, he does not discuss or cite the applicable IRS regulations. Nevertheless, we do agree that the two terms may be harmonized.

The indemnity term applies generally to all years of the marriage through the end of 2019 and is a general statement about how the parties would handle their tax

refunds and obligations for past years. The IRS regulations term, on the other hand, appears in the part of the MSA that contains terms specific to the couple's children and property. Further, the IRS regulations term is more specific in that it carves out two particular years of the couple's incomes taxes for its application and provides that for the "[i]ncome [t]axes due" for those two years, the parties would follow IRS rules and regulations. *See Forbau*, 876 S.W.2d at 133–34 (noting that when an insurance contract provision "makes a general statement of coverage, and another provision specifically states the time limit for such coverage, the more specific provision will control"); *cf. Jackson v. State Office of Admin. Hearings*, 351 S.W.3d 290, 297 (Tex. 2011) ("[A] specific statutory provision prevails as an exception over a conflicting general provision" (quoting *Tex. Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 637 (Tex. 2010))). The IRS regulations term is more specific as to 2018 and 2019, and accordingly, to the extent the terms conflict, the IRS regulations term governs for those two years. *See Pathfinder Oil*, 574 S.W.3d at 889. For any year before 2018, the IRS regulations term has no application, but the indemnity term does.

Rami says that the indemnity term is more specific because it is longer and more detailed, but he does not compare the indemnity term's length or detail to the IRS regulations that were incorporated into the MSA by the IRS regulations term. *See TotalEnergies*, 667 S.W.3d at 709. He does not tell us how or if they conflict with the

22

indemnity term.[6] *See* Tex. R. App. P. 38.1(i). Regardless, for the reasons we have explained, the IRS regulations term is more specific as to the couple's 2018 and 2019 taxes.

Nancy argues that Rami conceded in the trial court that the parties intended for the IRS regulations term, which his attorney referred to as the more specific provision at the status hearing, to prevail over the indemnity term, which his attorney referred to as "boilerplate." We agree that the MSA reflects the parties' intent for the IRS regulations term to control with respect 2018 and 2019 taxes, but the MSA does not reflect an intent for the indemnity term to be entirely omitted from the decree. The couple agreed in the MSA that for their taxes for years other than 2018 and 2019, the indemnity term would apply, and the trial court was required to enforce the MSA as written and include the indemnity term in its decree.[7] *See Glynn*, 651 S.W.3d at 355.

---

[6]The record indicates that the parties had already filed at least their 2018 taxes before the Corrected Decree's signing, but we have not found more detailed information about their filing. Rami has not cited to any part of the record from which we could gather whether the parties filed separately or jointly or any other information from which we could determine which regulations apply, and we have not found such information in our review of the record.

[7]The Corrected Decree provides that Rami will be 100 percent responsible for all debts and obligations associated with the entities awarded to him, including tax obligations. The record does not establish whether any outstanding tax liabilities of the parties at the time of the decree were taxes associated with any of these entities, and neither party makes any argument regarding this provision or argues that it conflicts with either the IRS regulations term or the indemnity term.

**D. Waiver and Estoppel**

Nancy's brief makes several arguments for why we should not consider Rami's argument on appeal. First, she asserts that quasi-estoppel prevents him from taking a different position on appeal than he had taken in the trial court.[8] "Quasi-estoppel precludes a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken." *Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 864 (Tex. 2000). Quasi-estoppel applies "when it would be unconscionable to allow a person to maintain a position inconsistent with one to which he acquiesced, or from which he accepted a benefit." *Id.* Thus, "quasi-estoppel forbids a party from accepting the benefits of a transaction and then subsequently taking an inconsistent position to avoid corresponding obligations or effects." *Lindley v. McKnight*, 349 S.W.3d 113, 131 (Tex. App.—Fort Worth 2011, no pet.).

Here, although Rami's attorney told the trial court that the IRS regulations term was the more specific term and controlled over the indemnity term, she also stated that Rami wanted the indemnity term to be included in the decree. Thus, the parties and the trial court were all aware that whatever position Rami's attorney had taken, *Rami's* position was that the decree should include the indemnity term, and Rami's attorney specifically asked for a ruling on the question. In ruling on the objection, the

---

[8]Nancy does not raise, and we do not consider, the doctrine of invited error. *See In re Mabray*, 355 S.W.3d 16, 32 (Tex. App.—Houston [1st Dist.] 2010, orig. proceeding) (stating that wife could not complain to appellate court about trial court's enforcement of arbitration provision after she had asked the court to enforce it).

trial court's obligation was to first attempt to determine the parties' intent from the language of the MSA. *URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 765 (Tex. 2018) (stating that "[u]nderstanding the context in which an agreement was made is essential in determining the parties' intent *as expressed in the agreement*, but it is the parties' *expressed intent* that the court must determine" (quoting *Anglo–Dutch Petrol. Int'l, Inc. v. Greenberg Peden, P.C.*, 352 S.W.3d 445, 451 (Tex. 2011)). Both the parties and the trial court understood that Rami was not acquiescing in his attorney's position about whether the indemnity term should be included.

Nancy argues that this case is similar to *Brooks v. Brooks*, 257 S.W.3d 418, 424 (Tex. App.—Fort Worth 2008, pet. denied). In that case, the husband and wife signed an MSA and filed it with the trial court in their divorce suit, but over a year later, their attorneys signed a letter, filed with the trial court, in which they stated that "it is agreed that the mediated settlement agreement . . . is void and this matter will be mediated again." *Id.* at 420. More than a year later, the case proceeded to trial at which both spouses testified and presented proposed property divisions. *Id.* After the trial, the husband obtained new counsel, who filed a motion for new trial asserting that the MSA should have been the basis for the trial court's decree. *Id.* at 421. The trial court denied the motion. *Id.* On appeal, this court held that it would be unconscionable to allow the husband to enforce the parties' MSA when the husband admitted that he had agreed to re-mediate and that he knew he would have to go to trial if the second mediation failed; he presented his own proposed property division at trial, which

25

differed from the property division in the MSA; he never objected at trial on the basis that the wife's proposed property division differed from the MSA; by the time of the hearing on the motion for new trial, one of the couple's properties had already been sold in accordance with the decree and the proceeds had been divided equally; and a judgment in accordance with the MSA would disadvantage the wife. *Id.* at 424.

Nancy argues that in this case, accepting Rami's change in position would "work to [her] disadvantage by making her liable for a raft of income tax obligations [she and Rami] agreed in the MSA she would not bear." *Brooks* is distinguishable. The husband in *Brooks* agreed to a second mediation, a trial, and the trial court's judgment before asserting the MSA's enforceability. Here, Rami consistently asserted the enforceability of the MSA, and his attorney made the trial court aware of Rami's position on the indemnity term and asked the trial court for a ruling on the issue. Although Nancy may or may not be disadvantaged by the inclusion of the indemnity term,[9] this situation is not like *Brooks*.

We understand Nancy's frustration with Rami's attorney's taking one position before judgment and waiting until the trial court has acted on that representation to argue the exact opposite. However, Nancy and the trial court knew that regardless of the legal argument that his attorney made, Rami did not agree with omitting the

---

[9]As noted above, the parties do not discuss the specific IRS regulations that govern their 2018 and 2019 income taxes. We need not discuss them to resolve this appeal, and we make no determination about whether Nancy will be disadvantaged by including the indemnity term.

indemnity term, and it was the trial court's duty to construe the agreement and harmonize its terms if possible. *See Piranha Partners v. Neuhoff*, 596 S.W.3d 740, 744 (Tex. 2020). Because of Rami's disagreement with omitting the term, his attorney specifically asked the trial court to rule on the question at the status hearing. Quasi-estoppel does not apply.

Next, Nancy argues that Rami waived his argument that the two tax provisions can be harmonized. She asserts that although Rami flip-flopped his position on which term was more specific and controlled, he consistently argued that only one provision should be included and never argued that the two terms could be harmonized. Nancy is correct that Rami's attorney initially agreed that the IRS regulations term was more specific and later argued in his motion to modify that only the indemnity term should be included, but the motion also stated that "if possible," the trial court "should harmonize the terms of the contract to give effect to all its terms" and that the trial court should include only the indemnity term "[i]f the [trial c]ourt is unable to harmonize the tax provisions." Rami therefore did not waive his argument that the terms should be harmonized if possible.

The two tax terms can be harmonized, and thus the indemnity term should not have been omitted from the decree. We sustain this part of Rami's issue.

27

## II. Valuation Findings

### A. Background

Attached to the MSA was Exhibit 1, a spreadsheet that listed the couple's property and gross and net values for the property. That list included HMMS, an entity awarded to Rami. The list's entry for most items of property was a single line showing the property's value or liabilities, but for HMMS, the exhibit identified specific assets and liabilities: a checking account, a savings account, a credit card, a BMW, and HMMS's payroll and malpractice insurance costs.

Exhibit 1 was a simple spreadsheet with no language explaining the valuations listed within it, but Part I of the MSA included a section indicating that the values of assets and liabilities listed in the exhibit might not be accurate and were included to illustrate the property division:

> The parties understand that the values reflected on Exhibit 1 are being used for the purposes of illustrating the division of property and that the actual values of assets, debts, taxes, accounts[,] and entities may in fact be different from those reflected on Exhibit l and that further the values reflected in Exhibit 1 may go up or down due to market fluctuations or other conditions.

Nevertheless, Part I further included each spouse's confirmation that the spouse had "made a *full and fair* disclosure of all of the assets and liabilities of the parties of which [the spouse] is aware on Exhibit 1 or elsewhere in this Agreement." [Emphasis added.] For any assets that had been omitted from the exhibit, the MSA required the decree to provide that if any undivided community assets were later found to have

28

been intentionally or fraudulently undisclosed by a party, those assets were partitioned to the other party.

After this court granted Rami mandamus relief and the new trial court signed an order reinstating the original divorce decree, Nancy then filed a supplemental motion to modify, correct, or reform the decree. After a hearing, the trial court signed a memorandum ruling in which the court found that the award of property in the reinstated decree "d[id] not conform with the terms set forth in the 'Mediated Settlement Agreement w/attachments' as signed by the parties and attorneys [that] was filed with the Court on February 6, 2020." The trial court consequently ordered the decree "corrected to specifically identify the assets awarded to each party (to include but not limited to real property, financial accounts, business, life insurance etc.) as set forth in the 'MSA with attachments' signed by the parties."

At the status hearing to discuss the proposed corrected decree, Rami's attorney objected that the decree should not list the specific assets and liabilities of two entities that had been allocated to him under the MSA—such as the BMW and bank accounts—because "generally speaking, we wouldn't do that" in a decree. With respect to the values of those specific assets and liabilities, Nancy's attorney noted that Rami's attorney had made "a standard objection to [the] inclusion of all the values of the accounts as of the date of the MSA." Nancy's attorney then argued that the dollar amounts needed to be included because the first trial court had ordered that the decree include the language from the MSA about intentionally undisclosed assets

29

becoming the property of the other spouse, and the parties would not be able to enforce that language if the corrected decree did not include the MSA's property values:

> [Nancy's attorney]: I believe that, based on your [memorandum] ruling and the intent of the MSA, that the specific dollar amounts need to be included; because if not, then we're not able to utilize the language that [the first trial court had] specifically directed us to put in there that talks about representations and omitted property and what happens in the event that property's either omitted or there wasn't an accurate disclosure of the value of an asset, et cetera.

> THE COURT: I know in typical divorces we would not put balances, but because of—for this particular case, I believe that *the numbers are important because they are set forth in the MSA*. I know there's concern about opening doors for unknown assets or some other matters, but I believe it's appropriate to put them in in this particular case. [Emphasis added.]

The trial court's Corrected Decree included the values listed in Exhibit 1 for some but not all the property. For example, the Corrected Decree included no value for real property and a Honda Pilot awarded to Rami. However, the Corrected Decree did include values for HMMS's assets and liabilities, the bank account for another entity, and three other bank accounts.[10] The property division of those assets and liabilities did not, however, state that the property division was limited to the value listed. For example, Exhibit 1 stated that HMMS's checking account had $100,909.78,

---

[10]Regarding each entity for which the Corrected Decree listed specific assets and liabilities of that entity, the decree stated that the entity had only those listed assets and liabilities. On appeal, Rami does not challenge the inclusion of that language in the decree.

and rather than award Rami only the $100,909.78 that Rami had disclosed, the Corrected Decree awarded Rami the "JP Morgan Chase Bank Checking Account, account number ending in *[account number omitted] with a balance of $100,909.78 as of February 6, 2020."

**B. The Parties' Arguments**

Rami makes no argument for how the trial court should have reconciled in the Corrected Decree the MSA's language regarding the values in Exhibit 1 with the MSA's language stating that each party had made a "full and fair" disclosure of all their assets and liabilities, and he does not explain how the inclusion of the property values in the decree did not serve the purpose of illustrating the property division, just as the values in the MSA had done. Rami also does not argue that the values included in the MSA were incorrect.[11] However, he points out that the MSA states that the listed values *could be* different than the actual values. He further argues that because the MSA said that the values might not be accurate and there was no other evidence of values, the trial court's inclusion of values in the decree was not supported by the evidence and contravened the MSA.

Nancy, on the other hand, argues that including the values was necessary to effectuate the MSA and to illustrate the property division because, if the parties

[11]In Rami's appellee's brief in Nancy's appeal, he challenges her brief for failing to cite the record to support her claim that he had provided unreliable values for the MSA, and from context, the brief appears to be impliedly arguing that the record would show that the values he had provided were reliable.

31

discovered any assets or liabilities that had not been divided by the decree, the trial court would need to reference "the amounts already awarded to the Parties" to decide how to divide the undivided property. She further contends that removal of the valuations would "impermissibly deviate from the MSA by removing material terms the Parties relied upon in deciding to enter the MSA."

**C. Analysis**

At the status hearing and at the hearing on Rami's post-judgment motion to modify, he did not raise the same specific complaint that he now argues on appeal—that having the values in the decree conflicted with the MSA. Indeed, the record contains no indication that his "standard objection" mentioned at the status hearing was based on the MSA at all. His motion to modify addressed only the tax issue and did not challenge the inclusion of the valuations in the decree.

By adding the valuations, the trial court was not making a factfinding; it was incorporating and attempting to follow part of the MSA,[12] and from the court's

---

[12]Rami argues in one sentence that "[t]here was no evidence admitted regarding the value of the assets as the values set forth in the decree were taken directly from Exhibit 1 attached to the MSA." As Rami acknowledges, the trial court incorporated the figures from the MSA and did so specifically *because* they had been included in the MSA; the trial court was not making a factfinding. However, even if we were to conclude that the trial court had made a factfinding by including the figures in the decree, we cannot determine whether the trial court made the finding without evidence aside from the MSA. Rami does not tell us whether any part of the voluminous record contains testimony or non-MSA evidence presented to the trial court at any point regarding values, and he does not tell us whether any evidence was presented at hearings from which no record was made or that were not included in the record. *See NexPoint Advisors, L.P. v. United Dev. Funding IV*, 674 S.W.3d 437,

hearing comments, it apparently did so in an attempt to effectuate other MSA terms. Rami's complaint is that the trial court contravened the MSA's terms by incorporating those figures because the MSA stated that the actual figures might be different, and thus incorporating the figures conflicted with the MSA, but that is a complaint that he did not raise in the trial court. *See* Tex. R. App. P. 33.1. He therefore did not preserve this argument for appeal. *See Ricks v. Ricks*, 169 S.W.3d 523, 528 (Tex. App.—Dallas 2005, no pet.) (holding that appellant wife had not preserved her appellate complaint that the child support payment periods and injunction terms in the divorce decree did not comport with the parties' MSA when her motion for new trial had complained only generally that there were discrepancies, which she did not identify, between the decree and the MSA); *see also Brantley v. Brantley*, No. 14-11-00583-CV, 2012 WL 727700, at *3 (Tex. App.—Houston [14th Dist.] Mar. 6, 2012, no pet.) (mem. op.) (holding wife had not preserved her complaint about variance between MSA and divorce decree); *Murphy v. Leveille*, No. 2-08-130-CV, 2009 WL 2619857, at

446 (Tex. App.—Fort Worth 2023, pet. filed) ("The appellate court has no duty to brief issues for an appellant . . . [and] we are not responsible for searching the record for facts that are favorable to the appellant's position."); *Ex parte D.K.*, No. 02-22-00020-CV, 2022 WL 15075939, at *3 (Tex. App.—Fort Worth Oct. 27, 2022, pet. denied) ("[I]n the absence of a reporter's record, we must presume that the hearing was properly conducted and that the trial court was presented with sufficient evidence to make its finding."). We know that there was at least one evidentiary hearing in the history of this proceeding, but Rami does not cite to any part of the record from that hearing in his argument—or any other evidentiary hearing, if there was one—and does not mention what, if anything, was discussed at that hearing. *See* Tex. R. App. P. 38.1(i). However, Rami's complaint here appears to be not that the decree is not supported by sufficient evidence but that the decree deviated from the MSA.

*2 (Tex. App.—Fort Worth Aug. 26, 2009, no pet.) (per curiam) (mem. op.) (holding same). We overrule the remainder of Rami's issue.

## Conclusion

Having overruled Nancy's three issues, and having sustained Rami's issue in part and overruled it in part, we reverse the trial court's judgment only as to its omission of the indemnity tax term and affirm it in all other respects. We remand this case to the trial court solely for the purpose of rendering a decree that incorporates the indemnity term in a manner consistent with this opinion. *See LeBlanc v. LeBlanc*, No. 09-20-00028-CV, 2022 WL 243163, at *6 (Tex. App.—Beaumont Jan. 27, 2022, no pet.) (mem. op.) (remanding case to trial court for issuance of final decree complying with parties' MSA).

/s/ Mike Wallach
Mike Wallach
Justice

Delivered: December 21, 2023